# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MIA Y. GLENN,                          :

            Plaintiff,                 :
                                           Case No. 3:09CV0296
   vs.                                 :
                                           District Judge Timothy S. Black
MICHAEL J. ASTRUE,                     :   Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,         :

            Defendant.                 :

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

        Plaintiff Mia Glenn sought financial assistance from the Social Security

Administration by applying for Disability Insurance Benefits ["DIB"] and

Supplemental Security Income ["SSI"] on December 20, 2004, alleging disability

since December 6, 2004, due to asthma.  (Tr. 24, 81-83, 131, 1272-74).  Plaintiff's

applications were denied initially and on reconsideration.  (Tr. 45-46, 59-65).

        Following a hearing held on February 28, 2008 (Tr. 1282-1315),

Administrative Law Judge ["ALJ"] James Knapp issued a decision on May 20,

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

2008, finding that Plaintiff was not disabled.  (Tr. 24-36).  That decision eventually became the final decision of the Social Security Administration (*see* Tr. 17-20), subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9) and supporting memorandum (Doc. #11); the Commissioner's Memorandum in Opposition (Doc. #15); Plaintiff's reply (Doc. #20); the administrative record; and the record as a whole.

Plaintiff seeks remand of the ALJ's decision to correct certain alleged errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 37 years old at the time of the ALJ's May 2008 decision (*see* Tr. 34), and thus was considered to be a "younger person" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2]  She has a high school education.  (Tr. 34); *see* 20 C.F.R. § 404.1564(b)(3).  Plaintiff has worked in the past as a housekeeper/cleaner, dietary aide, medical secretary, home health care attendant, and cashier/clerk.  (Tr. 34).

---

[2]Subsequent citations will identify only one set of the pertinent DIB or SSI Regulations, with full knowledge of the corresponding Regulations.

At the hearing before the ALJ, Plaintiff testified that she was five feet, five inches tall, and weighed 410 pounds.  (Tr. 1285).  She said that the least she had weighed in recent years was about 325 pounds in 2003 or 2004.  (*Id*.).  She indicated that she had tried to lose weight, but had been unable to get insurance approval for recommended bariatric surgery.  (Tr. 1307).

Plaintiff had last worked for a little over a month in 2007, making telephone calls for Yellow Book.  (Tr. 1285-86).  She said that job had been difficult because she was in a warehouse during cold weather, "and I couldn't sit for a long period of time."  (Tr. 1286).  Prior to that, she had worked as a cashier and stocker for Goodwill Industries for three months in late 2004.  (*Id*.).  That job ended "about the time I got sick."  (*Id*.).  Relocation caused Plaintiff to leave a medical secretary job that she held from 1998 to 2003.  (Tr. 1306).  Plaintiff felt that she no longer could do such previous jobs, "[b]ecause I don't think I could sit for like a whole eight hours or . . . do all the different running around you have to do."  (Tr. 1307).

Plaintiff described her breathing condition as "pulmonary hypertension," with "blood clots in my lungs."  (Tr. 1286).  Doctors first discovered such clots in about January 2005.  (Tr. 1286-87).  Plaintiff had visited the hospital frequently for shortness of breath and chest pains that make her "feel like I just am like fighting

for my breath, to catch my breath." (Tr. 1287). Asked to identify what might trigger that reaction, Plaintiff said that "it just comes[;] I think the change in weather has a lot to do with it." (Tr. 1306).

Plaintiff testified that she had not smoked since 2004, "[w]hen I got sick." (Tr. 1288, 1304). She had been using an oxygen tank since early 2005. (Tr. 1288-89). She also was taking the blood thinner Warfarin, but had discontinued using a Duragesic patch. (Tr. 1289). In addition, emergency room doctors had placed her on Prednisone "five or more times" in recent years. (Tr. 1306). In the fall of 2007, Plaintiff had been sent to a nursing home for therapy instead of being sent directly home from the hospital. (Tr. 1307-08).

Relative to her depression and anxiety, Plaintiff was taking Paxil and Klonopin, having been switched from Xanax some months before, and also took Trazodone at one time. (Tr. 1300, 1301). She went to counseling two times in mid-2007, but currently was not under the care of a psychologist or psychiatrist. (Tr. 1300-01). Plaintiff professed to have had problems with depression and anxiety for two or three years, "but it's really gotten worse since I've been getting sick." (Tr. 1301). When depressed, "I just . . . sit around [the] house and don't do anything." (*Id.*). She experienced crying spells "twice a week or so." (Tr. 1302).

Plaintiff indicated that anxiety-induced "panic attacks" affected her breathing problems; "that's when I really can't breath."  (Tr. 1306-07).

Plaintiff lived in a townhouse with her youngest daughter, who was then 15.  (Tr. 1302-03).  Asked to describe a typical day, Plaintiff testified that she would "[b]asically just sit in the house" and perhaps try to do some chores, such as washing dishes or laundry.  (Tr. 1302).  Her mother took Plaintiff to the store at least once a week, and during basketball season, Plaintiff went to five or six of her daughter's basketball games.  (*Id.*).  She last had gone to a store alone "over a month ago."  (*Id.*).  She could vacuum sitting down for 15 minutes at a time; "it takes me a while because I have to move from seat to seat."  (Tr. 1303).  She also could sweep with a broom.  (*Id.*).  Most meals were prepared by microwave.  (Tr. 1304).  She visited her mother about three times a week, but noone else.  (*Id.*).  Plaintiff said that she did not attend church, go to the movies, pursue hobbies, do yard work, or drink alcohol.  (*Id.*).  She also denied regularly sleeping or napping during the daytime, but claimed to sleep only four to five hours per night.  (Tr. 1304-05).

Plaintiff said that she could walk only about half a block before needing to stop; could stand in place for five minutes; could sit for 15 to 20 minutes; and

could lift maybe five to 10 pounds.  (Tr. 1305).  She blamed at least some of her

limitations on back pain.[3]  (*Id.*).

David Cugell, M.D., a pulmonary specialist, also testified at the hearing by

telephone (*see* Tr. 1298-99), as a Medical Expert ["ME"].  (Tr. 1290-1300).  Because

"a lot of the exhibits had not been sent" to Dr. Cugell before the hearing, the ALJ

first "summarized" those exhibits for him, as follows:

> . . . The new exhibits, well I'll tell you, they're mostly
> more hospitalizations.  In the exhibits that you had had,
> I noticed yesterday in going through the file that there
> appeared to be a gap between June of 2006 and June of
> 2007 in terms of hospitalizations.  The, the new records
> show further hospitalizations, typically of one or two
> day's length.  In January of '07, May of '07, March of '07,
> August of '07, and then she was in a nursing facility for
> a while that month too.  May of '07, as far as the latter
> part of '06 is concerned there were no hospitalizations
> but there were at least, at least three ER visits that I saw
> in September, October and November.  The one thing
> that I wanted to fax to you . . . I will just have to read it
> to you, explain it to you, is that there was a, in terms of
> medical test results[,] a CT scan[, at] exhibit 91F, page 5.

(Tr. 1290).

The ALJ later continued:

> . . . All right, let me locate this one chest CT scan from
> December of 2006, . . .  It's [the one] that you didn't see.
> And just see if it contains anything of value.  Okay, this

---

[3]Given the phrasing of the ALJ's question, it is unclear whether Plaintiff intended to
attribute her standing or her sitting limitation to back pain.  (*See* Tr. 1305).

was, all right, this was a December 11, 2006 CT of the
chest for pulmonary embolus evaluation . . .

* * *

Okay, and I'll just . . . read the report, it's only, it's less
th[a]n a page long.

["]Multiple axial views of the chest were obtained with
intravenous contrast medium [ . . . f]or pulmonary
embolus evaluation.  Then reformatted coronal views,
MIP exam were obtained.  There are small filling defects
in the right upper lobe pulmonary artery, and right
lower lobe pulmonary artery.  These finding[s] are high
suspicious for pulmonary embolus involving these
areas.  The left main pulmonary artery and its trenches
are well visualized without filling defect or other
significant abnormality.  A minimum amount of
pulmonary infiltration in the right lower lobe is seen.
Note is made of lymph nodes in the pre[]tracheal area,
aortic pulmonary window[,] and subcarinal area.  The
largest one measures approximately 1.56 cm,
centimeters[,] in size.  The clinical significance of this
finding is not clear at this time.  No pleural effusion is
seen.  No evidence of thoracic aortic aneur[y]sm.["]
And then the impressions are: ["]one[,] pulmonary
embolus involving the right upper lobe and right lower
lobe pulmonary artery branches; two, minimum amount
of pulmonary infiltration in the right lower lobe; three,
multiple lymph nodes in the p[retra]chial area, aortic
pulmonary window and subcarinal area[.  T]he largest
one measures 1.5 centimeters.["]  Clinical significance
not determined and no evidence of thoracic aortic
aneur[y]sm.

(Tr. 1292-93; *see* Tr. 916 [Imaging Consultation Report dated 12/11/06]).

The following exchange later took place between the ALJ and the ME:

[ALJ]: Okay. Let me, I'm going to check just one other report. Okay. It's just one other report in here. At exhibit 94F[,] page 20. What do we have here?

[ME]: You mean there [are] 30 additional exhibits?

[ALJ]: Yes, . . . our staff kind of messed up by not sending them to you when they came in originally and that's why we tried to get a[]hold of you yesterday.

[ME]: I wasn't home, I wasn't in the office. Okay, I'm sorry.

[ALJ]: Well[,] that's, that was our fault . . . And I think that the question I'm going to have to decide is whether there is enough in here to warrant sending you the additional records. I'm looking at . . . another CT chest done for pulmonary emboli in January of 2007 and I'll just tell you what it showed. Rather th[a]n –

[ME]: Wait a minute, the one you just read to me was dated when?

[ALJ]: December of '06.

[ME]: Okay, and she had another on[e] a month later?

[ALJ]: Yes.

[ME]: Okay.

[ALJ]: And this one says ["P]oor visualization of the right pulmonary arteries which are felt to represent either residual thrombus[,] scarring[,] or ven[o]us in[-]flow[. Two,] nodular [pleural] thickening and infiltrates in the right lung base. Three[,] non-specific superior["] – I cant' read all the words, but ["]lymph[adenopa]thy.["] That, that's basically, basically it.

(Tr. 1294-95; *see* Tr. 944 [Diagnostic Imaging report dated 1/02/07]).

Dr. Cugell testified that although Plaintiff had "multiple pulmonary complaints" and had been treated for "several pulmonary diseases," documentation as to the significant severity or even the existence of those diseases was "completely lacking."  (Tr. 1291).  For example, while Plaintiff had been treated for "bronchial status asthma," no pulmonary function test appeared in the record.  (*Id.*).  Additionally, while her chest pain was attributed to pulmonary hypertension, there was no documentation of elevated pulmonary artery pressure.  (*Id.*).  Dr. Cugell opined that Plaintiff would not satisfy Listing 3.03 (for asthma) "because she's not wheezing," and she was hospitalized for chest pains rather than "respiratory symptoms commonly associated with exacerbation of asthma."  (*Id.*).

Dr. Cugell also noted that while Plaintiff had been diagnosed with a pulmonary embolism, Plaintiff's reported chest pain "doesn't persist" or "increase in severity" to a degree necessitating emergency room visits or hospitalizations, and "significant elevation of the pulmonary artery pressure" had never been demonstrated.  (Tr. 1292).  "In other words, in general her symptoms are not supported by detective [sic?] measures."  (*Id.*).

Dr. Cugell confirmed that the December 2006 CT report read into the record by the ALJ would not alter his testimony.  (Tr. 1293).  He interpreted that test as "residue of the pulmonary embolism diagnosis that [Plaintiff has] carried for some time," giving "no reason to suspect" a new embolism.  (*Id*.).  Additionally, he testified that the lymph node and infiltrate findings in that test had "no particular immediate clinical significance" in the absence of relative symptoms.  (Tr. 1294).  Moreover, he opined that lymph nodes "are entitled to be a little bigger th[a]n normal" in someone weighing 400 pounds.  (*Id*.).  Dr. Cugell then testified that the January 2007 CT reported "in essence . . . the same [ ] findings" as those before.  (Tr. 1295).  Asked whether Plaintiff's symptoms were due to her obesity or other medical conditions, Dr. Cugell opined that Plaintiff had "primarily an emotional problem, not an organic medical problem."  (*Id*.).

On cross-examination, Dr. Cugell declined to comment on Plaintiff's need for oxygen without knowing "what her blood oxygen levels are."  (Tr. 1296).  While acknowledging her complaints of shortness of breath, he noted that "no explanation for her shortness of breath has been forthcoming."  (*Id*.).  "Her breathing capacity has been tested, her lung, her cardiac function appears to be intact . . .  The CT scans are stable . . ."  (*Id*.).

Dr. Cugell recalled Plaintiff's pulmonary artery pressure readings as being not "particularly high," and further noted that such measurements were "not reliable" anyway, unless performed via a pulmonary artery catheter.  (*Id.*).  He opined that "[p]ulmonary artery pressure at 40" would be "a little bit high but by no means markedly elevated."  (Tr. 1298).  Although he "d[id]n't doubt that [Plaintiff had] had a pulmonary embolism" and might "have a slight increase in pulmonary artery pressure," Dr. Cugell opined that those "slight abnormalities" would not explain her symptoms.  (*Id.*).  He denied that Plaintiff's multiple hospitalizations would meet Listing 3.03 if caused by "actual organic physical problems," because "I don't think that the lad[y']s underlying condition is asthma."  (Tr. 1297).  "As far as the records I reviewed indicate[ ], she has breathing difficulty, but it is not the result of asthma."  (*Id.*).

Suman Srinivasan then testified as a vocational expert ["VE"].  (Tr. 1308-13).  The VE classified Plaintiff's past relevant work as light, unskilled (housekeeping cleaner, cashier II); medium, unskilled (dietary aide); sedentary, skilled (medical secretary); medium, semi-skilled (home health aide); and light, semi-skilled (cashier checker).  (Tr. 1309-10).  Were Plaintiff limited to lifting no more than 10 pounds frequently and 20 pounds occasionally; sitting and standing for no more than 30 minutes each at a time, for no more than six hours and four

hours respectively; no significant or continuous walking as part of her regular job duties; no crawling, crouching, climbing, kneeling, or stooping below waist level; no work at unprotected heights, around moving machinery, at temperature extremes, in wet or humid areas where there would be significant exposure to fumes, smoke, dust, odors, or poor ventilation; no contact with the public and only occasional contact with supervisors and coworkers; no complex instructions; and only low stress work activity,[4] the VE testified that Plaintiff could perform 2,800 jobs at the sedentary exertion level. (Tr. 1311).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of medical records relative to Plaintiff's physical work-related abilities.[5] Those can be summarized as follows.

Plaintiff initially was seen for respiratory complaints in December 2003, when she went to the emergency room for a cough and progressive wheezing. (Tr. 215). Dr. Irv E. Edwards examined her, noted that she had bursts of

---

[4]Although the ALJ's residual functional capacity finding did not limit Plaintiff to jobs with no significant exposure to environmental irritants, occasional interaction with others, and no complex instructions (*see* Tr. 31), the ALJ did include such limitations in the hypothetical posed to the VE, and the available jobs to which the VE testified thus reflect those additional limitations. (*See* Tr. 35, 1311).

[5]As Plaintiff has raised no substantive issues concerning her mental impairments, discussion will focus on the evidence regarding her physical impairments.

coughing with end-expiratory wheezing, and diagnosed acute bronchitis and asthma exacerbation.  (Tr. 216).  Diagnostic testing was normal, showing "[n]o acute cardiopulmonary disease" and a normal (97 percent) oxygen saturation level.  (Tr. 215, 222, 226).  Dr. Edwards discharged Plaintiff in stable condition with prescribed medications, and advised her to stop smoking.  (Tr. 215-16).

Plaintiff returned to the emergency room in June 2004, complaining of a one-week history of coughing, increased shortness of breath, and some wheezing.  (Tr. 241).  Dr. Felino P. Tordilla examined Plaintiff, noted that her oxygen level was normal (96 percent), diagnosed reactive airway disease with acute exacerbation and acute bronchitis, and prescribed medication and an inhaler.  (Tr. 242).

In September 2004, Plaintiff again visited the emergency room, complaining of a cough and difficulty breathing.  (Tr. 247).  She reported smoking one-half to one pack of cigarettes per day.  (*Id.*).  Her oxygen level was normal (97 percent), and she was diagnosed with acute bronchitis and discharged in good condition.  (Tr. 247-52).

Treatment records from December 2004 through July 2006 produced by Dr. Georges S. Yacoub, a pulmonologist, show that Plaintiff was treated on multiple occasions for complaints of shortness of breath and chest pain, and that Plaintiff

also contacted Dr. Yacoub's office to ask questions about her medications and to report when she was going or had been to the emergency room.  (Tr. 620-745).

Plaintiff was hospitalized in early December 2004 after reporting increasing shortness of breath.  (Tr. 258).  Chest x-rays showed bilateral pneumonia.  (Tr. 264).  At the time of discharge, Dr. Yacoub diagnosed Plaintiff with pneumonia, asthma exacerbation, hypoxemia, and morbid obesity.  (Tr. 258).

Plaintiff returned to the hospital on December 26, 2004, with worsening shortness of breath and persistent fluid in both lungs.  (Tr. 275).  Upon discharge on January 3, 2005, Dr. Yacoub diagnosed pulmonary hypertension, chronic thromboembolic disease, hypoxemia, and cor pulmonale (right ventricular enlargement secondary to a lung disorder that produces pulmonary hypertension), and said that Plaintiff could perform physical activity as tolerated. (Tr. 275-76).  An echocardiogram performed during her stay showed mild to moderate pulmonary hypertension, an ejection fraction estimated at 75 percent, and mildly elevated pulmonary pressure estimated at 40 to 41 mmHg.  (Tr. 282).

On January 5, 2005, Dr. Yacoub opined in a letter that Plaintiff had a "severe lung condition which require[d] the use of medication and oxygen supplementation," and was "severely impaired in physical activity and require[d] assistance with daily activities."  (Tr. 732).

-14-

On January 11, 2005, a pulmonary function study showed that Plaintiff had a forced vital capacity ["FVC"] of 1.4 and forced expiratory volume ["FEV1"] of 1.38. (Tr. 728). The study did not specify whether those results were obtained prior or subsequent to the administration of bronchodilators. (*See id.*). Plaintiff's oxygen saturation was 94 percent on that date. (Tr. 727). The record contains no subsequent pulmonary function studies.

On January 18, 2005, Plaintiff returned to the hospital with increasing shortness of breath and chest pain, and was diagnosed with bilateral pneumonia. (Tr. 295, 313). Upon discharge on February 8, 2005, Dr. Yacoub diagnosed Plaintiff with pulmonary embolus, pulmonary hypertension, and pulmonary infarct, and allowed physical activity "as tolerated." (Tr. 295-96). Testing in February 2005 showed that Plaintiff's oxygen saturation was normal, at 98 percent.[6] (Tr. 721).

In early March 2005, Plaintiff called Dr. Yacoub's office complaining of "extreme pain in lung area," but later called back and stated that she felt "much better" after taking Xanax and Dilaudid. (Tr. 719). On March 8, 2005, she went to the hospital for shortness of breath, swelling of her legs, and chest pain. (Tr. 316).

---

[6]Aside from a 94 percent reading in May 2005 (*see* Tr. 707), Plaintiff's oxygen saturation thereafter remained consistently normal through June 2006. (*See* Tr. 621, 627, 634, 639, 646, 651, 654, 659, 662, 668, 681, 686, 694-95, 700, 710, 714).

Her oxygen saturation was normal.  (Tr. 323).  Dr. Yacoub diagnosed pulmonary hypertension, pulmonary embolus, and pedal swelling, and again imposed no limitations on physical activity.  (Tr. 316-17).

Plaintiff went to the emergency room on April 6, 2005, complaining of chest pain and shortness of breath, though her oxygen saturation level was normal.  (Tr. 325-27).  Plaintiff was diagnosed with chest pain and a history of reactive airway disease and pulmonary embolus.  (Tr. 326).

Chest x-rays taken on July 28, 2005, were compared to studies from 10 days prior and showed improvement, with "near complete clearing" of Plaintiff's pneumonia, and everything else within normal limits.  (Tr. 687).

On July 20, 2005, Dr. Dimitri Teague, a state agency physician, reviewed Plaintiff's medical records, including her multiple hospital and emergency room visits, her history of asthma, obesity, and respiratory complications due to asthma and pulmonary embolism, and her January 2005 echocardiogram.  (Tr. 444-53).  Dr. Teague opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and could stand and/or walk, and could sit, for about six hours in an eight-hour day.  (Tr. 447).  He further opined that she never could climb ladders, ropes, or scaffolds, but occasionally could climb ramps and stairs,

balance, and crawl; frequently could stoop, kneel, and crouch; and should avoid even moderate exposure to environmental irritants.  (Tr. 448, 450).

In October 2005, Walter A. Holbrook, M.D., another state agency physician, reviewed Plaintiff's medical records and affirmed Dr. Teague's July 2005 assessment.  (Tr. 453).

In January 2006, Plaintiff informed her doctor that she was "not taking medications."  (Tr. 658).  In March 2006, left ventrical myocardial perfusion testing was abnormal, indicating a low risk of heart issues, but Plaintiff's stress test was otherwise normal, with an ejection fraction rate of 64 percent and no chest pain.  (Tr. 644-45).

Plaintiff's multiple hospital and emergency-room visits from March 2006 through December 2007 (Tr. 555-1249) included treatment from Dr. Padmaja Sattu, her primary care physician, for various complaints, including swelling in her right knee (Tr. 767), problems sleeping (Tr. 774), coughing, chest pain, obesity (Tr. 764, 1251, 1254), anxiety (Tr. 751), pulmonary embolism/pulmonary hypertension (Tr. 1251), heart rhythm problems and gastroesophageal reflux disease ["GERD"] (Tr. 762), and shortness of breath.  (Tr. 784-85, 1254).  In June 2007, Dr. Sattu noted that she did "not know the reason" for Plaintiff's increasing

shortness of breath, and that she had talked to Plaintiff multiple times about her need to lose weight.  (Tr. 785-86).

## III.  THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.  <u>Applicable Standards</u>

The Social Security Administration provides benefits to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  An applicant bears the ultimate burden of establishing that he or she is under a "disability." *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 13-15); *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful
        activity?

2.      Does the claimant suffer from one or more severe
        impairments?

3.      Do the claimant's severe impairments, alone or in
        combination, meet or equal the criteria of an
        impairment set forth in the Commissioner's
        Listing of Impairments, 20 C.F.R. Subpart P,
        Appendix 1?

4.      Considering the claimant's residual functional
        capacity, can the claimant perform his or her past
        relevant work?

5.      Considering the claimant's age, education, past
        work experience, and residual functional
        capacity, can the claimant perform other work
        available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

At Step 1 of the sequential evaluation, ALJ Shell found that Plaintiff met

the insured status requirements of the Act through December 2009.  (Tr. 27).  The

ALJ also found that Plaintiff had not engaged in substantial gainful activity since

June 6, 2004.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of

morbid obesity; recurrent chest pain and shortness of breath possibly secondary

-19-

to cardiomegaly; bronchitis episodes and/or anxiety; dysthymia; and a generalized anxiety disorder. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (Tr. 31).

At Step 4, the ALJ found that Plaintiff lacked the residual functional capacity ["RFC"] to lift more than 10 pounds frequently or 20 pounds occasionally; sit for more than 30 minutes at a time or a total of more than six hours per day; stand for more than 30 minutes at a time or a total of more than four hours per day; do significant or continuous walking as part of her regular job duties; stoop below waist level more than occasionally; crawl, crouch, climb, or kneel; work at unprotected heights or around moving machinery; or do other than low stress work activity (i.e., no job involving fixed productions quotas, or that otherwise involves above average pressure for production, work that is other than routine in nature, or work that is hazardous). (*Id.*). The ALJ then found that Plaintiff is unable to perform any of her past relevant work. (Tr. 34).

Nevertheless, the ALJ found at Step 5 that Plaintiff remained capable of performing jobs that exist in significant numbers in the national economy. (Tr. 35). This assessment, along with the ALJ's findings throughout his sequential

evaluation, ultimately led him to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI benefits.  (Tr. 36).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    The Parties' Contentions

Plaintiff's Statement of Errors raises four alleged errors by the ALJ, which can be summarized as follows:

> 1) the ALJ's decision was not based on all relevant evidence in the record, as the ALJ assigned "inordinate weight" to the testimony of the ME, who had reviewed "significantly less" than the complete medical record;
>
> 2) although the ALJ accepted Plaintiff's morbid obesity as a severe impairment, he did not conduct an "individualized assessment" of the impact of that obesity on Plaintiff's other impairments or on her ability to function in the workplace;
>
> 3) the ALJ relied on selected portions of the ME's testimony to support a non-disability finding, but failed

-22-

to explain why he did not credit other testimony by the
ME that was consistent with a disability finding; and

4) based in part on medical evidence identical or similar
to that presented in this case, Plaintiff was awarded
benefits on a subsequent application from May 21, 2008,
or one day after the ALJ's denial in this case.

(Doc. #9 at 1-2).  In addition, Plaintiff's supporting memorandum argues that the

ALJ did not offer an adequate explanation for rejecting evidence from Plaintiff's

treating pulmonologist and primary care physician.  (Doc. #11 at 3-5).  She

further suggests that the ALJ erred by not considering whether her breathing

difficulty satisfied Listing 3.02B for restrictive ventilatory disease, or some other

Listing.  (*Id.* at 6-7).[7]

In response, the Commissioner first urges that substantial evidence

supports the ALJ's finding that Plaintiff did not have severe cardiac and

respiratory impairments, and that the ALJ did consider such impairments in

combination with those that he found to be severe.  (Doc. #15 at 10).  Defendant

further argues that substantial evidence also supports the ALJ's finding that

Plaintiff did not meet or equal any Listing, in that the ALJ considered any

medical evidence not reviewed by Dr. Cugell, and Plaintiff has not presented

---

[7]In her reply memorandum, Plaintiff alludes to yet another argument, suggesting that
the ALJ erred in assessing her credibility.  (*See* Doc. #20 at 3).  In accordance with case law in
this Circuit, however, this Court will not consider new allegations of error first introduced via a
reply brief.  *See, e.g., Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986); *Boothe v. Comm'r of
Soc. Sec.*, No. 1:06-CV-00784, 2008 WL 281621, at *8 n.1 (S.D. Ohio Jan. 31, 2008) (Spiegel, J.).

evidence to overcome the ALJ's findings.  (*Id.* at 10-13).  Additionally, Defendant

contends that the ALJ properly handled medical source evidence and properly

considered Plaintiff's obesity.  (*Id.* at 13-15).  Finally, Defendant asserts that

evidence relevant to Plaintiff's subsequent successful application for benefits is

not properly before this Court and may not be considered with respect to the

denied application at issue here.  (*Id.* at 15-16).

### B. <u>Medical Source Opinions</u>

#### 1. *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle

that greater deference generally is given to the opinions of treating medical

sources than to the opinions of non-treating medical sources.  *Rogers v. Comm'r of*

*Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2).  This is so,

the Regulations explain, "since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [a DIB

claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examiners, such as consultative examinations

or brief hospitalizations . . ."  20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at

242.  In light of this, an ALJ must grant controlling weight to a treating source's

opinion when it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record.  *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there.  Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188, at *4.  The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding."  *Rogers*, 486 F.3d at 242.

> 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180, at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id.*, at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency and specialization.  *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p, at *2-*3.

**C.    Analysis**

1.    *Dr. Cugell's ME Opinion*

Plaintiff first alleges that the ALJ erred by assigning "inordinate weight" to the medical expert testimony of Dr. Cugell, who had reviewed "significantly less" than the complete medical record.  (Doc. #9 at 1; *see also* Doc. #11 at 2-4, Doc. #20 at 3-5).  As the transcript of the ME's hearing testimony, quoted *supra*, plainly illustrates, Dr. Cugell personally had not reviewed some of Plaintiff's medical records (from June 2006 to June 2007) prior to testifying at the

-26-

administrative hearing.  (*See* Tr. 1290, 1292-93, 1294-95).[8]  Nevertheless, that less-

than-complete review does not undermine the value of Dr. Cugell's testimony to

the extent advocated by Plaintiff.

As the hearing transcript further illustrates, prior to Dr. Cugell's testimony,

the ALJ first summarized for Dr. Cugell the general nature of the additional

medical records missing from the materials that Dr. Cugell had reviewed – *i.e.*,

"mostly more hospitalizations . . . typically of one or two day's length[ i]n

January of '07, May of '07, March of '07, August of '07, and . . . she was in a

nursing facility for a while[,] . . . too[, plus] . . . at least three ER visits . . . in

September, October and November" [of 2006].  (*See* Tr. 1290).  The ALJ then read

aloud to Dr. Cugell and into the record the contents of the two missing exhibits

that contained objective test results for Plaintiff – *i.e.*, "a December 11, 2006 CT of

the chest for pulmonary embolus evaluation" (Tr. 1292-93; Tr. 916 [Imaging

Consultation Report dated 12/11/06]), and "another CT chest done for

pulmonary emboli in January of 2007.  (Tr. 1294-95; Tr. 944 [Diagnostic Imaging

report dated 1/02/07]).[9]

---

[8]*See also* Tr. 28, where ALJ Knapp acknowledges that "Dr. Cugell did not have the opportunity to review the entire record."

[9]Notably, Plaintiff's counsel did not object to this approach at the time of the hearing, and was given an opportunity to cross-examine the ME.  (Tr. 1290-98).

After hearing that additional information, asking some questions, and providing some clarification (*see* Tr. 1293-94, 1294-95), Dr. Cugell confirmed that such objective findings would not affect his opinion regarding Plaintiff's lack of Listing-level impairments.  (*See id.*).  Plaintiff's attorney raised nothing on cross-examination to dissuade the ME from that conclusion.  (*See* Tr. 1295-98).  As such, substantial evidence supports the ME's conclusion that the medical documentation did not show Plaintiff to have a Listing-level pulmonary or cardiac impairment.

Beyond the ME's testimony that the missing medical records as summarized would not change his opinion, however, the record demonstrates that the ALJ himself <u>did</u> review the entire medical record, and affirmatively found that nothing among the materials omitted from Dr. Cugell's review would alter his conclusions.  As Plaintiff admits (*see* Doc. #11 at 2-3, Doc. #20 at 4), ALJ Knapp's decision specifically stated as follows:

> Since many exhibits were submitted just a week before the hearing [citations to the record omitted], Dr. Cugell did not have the opportunity to review the entire record, but **there is nothing in the later record that changes his overall assessment of the nature of [Plaintiff]'s medical conditions**.

(Tr. 28) (emphasis added).  More significantly, he later elaborated at length:

The Medical Expert, Dr. Cugell, testified that [Plaintiff] does not have any ongoing, medically-determinable significant respiratory or cardiac condition. I note that Dr. Cugell did not review the medical record past Exhibit 87F but **there is nothing in any of the subsequent medical records admitted in this case which establishes the existence of any serious cardiac or respiratory condition.** On the contrary, **the available medical evidence demonstrates that [Plaintiff]'s cardiac functioning is essentially intact** despite her massive obesity and resulting high risk of atherosclerotic disease. [Plaintiff] does have a history of multiple emergency room visits and even hospital admissions for complain[t]s of chest pain. But as noted above a review of these treatment episodes in the voluminous record indicates that **[Plaintiff]'s chest pain complaints were each individually determined to be noncardiac in origin and instead due to benign conditions such as self-perceived and non-specific chest wall pain** [citations to the record omitted]. **The most significant cardiac testing was done in August 2007** [citation to the record omitted]. **An echocardiogram taken at the time showed normal left and right ventricular systolic functioning with a normal ejection fraction of 60 percent** [citation to the record omitted]. **This level of retained cardiac functioning is not indicative of any significant cardiovascular condition requiring treatment**, and as such **I continue to accept Dr. Cugell's testimony that there is no "severe" cardiac impairment** in this case **based on an independent review of the subsequent record**.

**There is also no evidence of any ongoing respiratory condition of record in this case which could likewise be considered severe**. The bulk of the medical evidence of record in this case consists of numerous records of emergency room visits for various respiratory complaints [citations to the record omitted]. **Dr. Cugell**

**considered most of these records and concluded that they did not demonstrate the existence of any true ongoing respiratory condition which could reasonably be construed as "severe."** . . . The medical expert, Dr. Cugell, testified that [Plaintiff] was appropriately treated at that time and that these conditions essentially resolved.  His testimony in this respect is again well-supported by the record.  **Both [Plaintiff]'s diagnoses of chronic pulmonary emboli and pulmonary hypertension appear to have become inherited diagnoses which were referenced and then "re-diagnosed" at the time of most subsequent emergency room visits and hospitalizations, even though there was no testing showing further clotting in the claimant's lungs or elevated systolic o[r] diastolic blood pressure levels in [Plaintiff]'s pulmonary arteries.**

Dr. Cugell stated that there is no evidence that either [Plaintiff]'s pulmonary hypertension or pulmonary emboli were continuing to the extent that they ever existed.  **I also note that [Plaintiff] was advised to reduce her use of blood-thinning medication in August 2007** [citation to the record omitted].  **A diagnosis of ongoing pulmonary emboli is likewise contradicted by these circumstances**.  I also find no pulmonary evidence of record in this case which would justify [Plaintiff's] apparent use of supplemental [o]xygen.  Treatment records have consistently shown evidence of adequate [o]xygen saturation levels and there is no evidence that [Plaintiff] has any respiratory conditions which would result in chronically diminished [o]xygen saturation levels [citations to the record omitted].  **In sum, Dr. Cugell's testimony that [Plaintiff] does not have a medically-determinable cardiac or respiratory impairment is well-supported by the medical evidence of record and is accepted**.

(Tr. 29-30) (emphasis added).  The ALJ's citations in support of these findings included many of the documents that had not been made available to Dr. Cugell, including an August 2007 echocardiogram and later emergency room visit records.  (*See id.*).  As the need for a medical expert opinion is left to the ALJ's discretion, 20 C.F.R. § 404,1527(f)(2)(iii), the ALJ acted within the scope of his authority in deciding to depend upon his own review of those additional documents.  Accordingly, substantial evidence appears to support the ALJ's conclusion that Plaintiff's subsequent medical information in the record would not have changed Dr. Cugell's opinion.

Most significant of all, however, is the fact that while Plaintiff bemoans Dr. Cugell's failure to review the entire record, she has brought to this Court's attention nothing within the omitted medical records purported to prove that Dr. Cugell's and ALJ Knapp's conclusions were mistaken.  (*See* Doc. ##9, 11, 20).  For example, Plaintiff identifies no test results alleged to show enduring low blood-oxygen saturation levels; no x-rays, MRIs or scans alleged to show new pulmonary emboli; and no other objective measures indicative of severely impaired cardiac or respiratory functioning.  She also points to no treating physician opinions setting forth limitations inconsistent with those found by the ALJ; indeed, to the contrary, Plaintiff concedes that "the current record contains

no residual functional capacity ('RFC') statements . . . from [her] treating physicians." (Doc. #11 at 4). Plaintiff bore the burden of establishing that her impairments met or equaled a Listing. 20 C.F.R. § 404.1512(a). Absent contrary evidence, the ALJ reasonably relied upon the opinion of the ME as supplemented by the ALJ's own review of the medical record as a whole, and substantial evidence supports the ALJ's conclusions in that regard.

In addition, because the ALJ found that Plaintiff did have other "severe" impairments (*e.g.*, morbid obesity) (*see* Tr. 27) despite the absence of any "severe" respiratory or cardiac condition, the ALJ continued to analyze Plaintiff's work-related abilities under the remaining Steps of the sequential evaluation. (*See* Tr. 31). "According to the regulations, upon determining that a claimant has one severe impairment, the [ALJ] must continue with the remaining steps in his disability evaluation." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Where the ALJ did so, and thus "could consider" other impairments alleged by the claimant in determining her residual functional capacity, his "failure to find that claimant's [additional] condition constituted a severe impairment could not constitute reversible error." *Id.*

As recently clarified by other judges of this Court:

> In other words, if an ALJ errs by not including a
> particular impairment as an additional severe

-32-

> impairment in step two of his analysis, the error is
> harmless as long as the ALJ found at least one severe
> impairment, continued the sequential analysis, and
> ultimately addressed all of the claimant's impairments
> in determining [her] residual functional capacity.

*Meadows v. Comm'r of Soc. Sec.*, No. 1:07cv1010, 2008 WL 4911243, at *13 (S.D.

Ohio Nov. 13, 2008) (Barrett, J.); *Jamison v. Comm'r of Soc. Sec.*, No. 1:07cv152, 2008

WL 2795740, at *8 (S.D. Ohio July 18, 2008) (Dlott, J.) (both citing *Swartz v.*

*Barnhart*, 188 F. App'x 361, 368 (6th Cir.2006); *Maziarz, supra*).

Because the record demonstrates that ALJ Knapp did proceed to consider

Plaintiff's pulmonary problems in establishing Plaintiff's RFC (*see* Tr. 31), even

any error in his failure to classify such problems alone as of Listing-level "severe"

would qualify as harmless.

Finally in this regard, Plaintiff's belated suggestion that the ALJ may have

erred by failing to find that Plaintiff met or equaled Listing 3.00C (Doc. #20 at 5,

6, 10), Listing 3.02A or B (*id.* at 6), or Listing 3.09 (*id.* at 6, 7) also is to no avail.  In

the first instance, Plaintiff effectively waived these arguments by failing to raise

them in her statement of errors and supporting memorandum.  (*See* Doc. ##9,

11); *see* footnote 7, *supra*, and cases cited therein.  Moreover, when explicitly

questioned by the ALJ as to whether Plaintiff claimed to qualify for benefits

under Listing 3.09, Plaintiff's counsel denied advancing any such claim; "No, our

argument was 303B." (Tr. 1287).  Having opted, with advice of counsel, to

proceed under Listing 3.03B only, Plaintiff now cannot abdicate responsibility for

her informed and/or strategic choices by alleging ALJ error.   Plaintiff's

allegations of error based on the ALJ's reliance on ME testimony must be denied.

### 2.    *Obesity Assessment*

Plaintiff next contends that the ALJ erred by failing to conduct an

"individualized assessment" of the impact of Plaintiff's obesity on Plaintiff's

other impairments or her ability to function in the workplace.  (Doc. #9 at 1, Doc.

#11 at 5-7).  Plaintiff urges that applicable Social Security law requires an ALJ to

do such an "individualized assessment" in order to determine "whether obesity

is a 'severe' impairment in any given case."  (Doc. #11 at 5, citing SSR 02-1p).

Social Security Ruling 02-1p sets forth Social Security policy for evaluation

of obesity, and does provide that the Social Security Administration "will do an

individualized assessment of the impact of obesity on an individual's functioning

when deciding whether the impairment is severe."  SSR 02-1p, 2000 WL 628049,

at *4.  Addressing Listing-level impairments, that Ruling further provides in

pertinent part as follows:

> We will [ ] find equivalence if an individual has
> multiple impairments, including obesity, no one of
> which meets or equals the requirements of a listing, but
> the combination of impairments is equivalent in severity

to a listed impairment.  **For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems.**  Obesity makes it harder for the chest and lungs to expand.  This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body.  Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected.  Thus, **we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings**.[FN4]

**However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments**.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  **We will evaluate each case based on the information in the case record**.

*Id.*, 2000 WL 628049, at **5-6 (emphasis added).

Although Plaintiff accurately captures the intent of SSR 02-1p, its application to her particular case does not yield the result that she desires.  While that Ruling does provide that ALJs "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe," *id.*, 2000 WL 628049, at *4 (emphasis added), Plaintiff herself recognizes that ALJ Knapp did conclude that Plaintiff's "morbid obesity"

-35-

is a "severe" impairment (Tr. 27, 29; *see also* Doc. #11 at 5), thus fulfilling the

purpose of that mandate.  Any argument based on the ALJ's alleged failure to

conduct an "individualized assessment" therefore is moot.

Plaintiff's second argument under SSR 02-1p is no more successful.  In

apparent reliance on some of that Ruling's wording,[10] Plaintiff in essence urges

that "if the restrictive impairment is due to the pressure caused by extraordinary

amounts of fatty tissue surrounding the organs and restricting the lungs' capacity

to inflate fully," additional evidence that the ALJ found to be absent from the

record would be irrelevant.  (Doc. #11 at 6, referring to Tr. 31).[11]  Plaintiff's

hypothesis, however, ignores the Ruling's later admonition that the

Commissioner "will not make assumptions about the severity or functional

effects of obesity combined with other impairments," but rather "will evaluate

each case <u>based on the information in the case record</u>."  SSR 02-1p, 2000 WL

628049, at *6 (emphasis added).  That provision is consistent with the fact that the

burden of proving the existence of a disability lies with the claimant, not the ALJ.

*See* 20 C.F.R. § 404.1512(a).  Because Plaintiff points to no "laboratory findings" or

---

[10](*See* Doc. #11 at 6,, n. 7).

[11]There, the ALJ declined to find that spirometric testing performed in January 2005 established that Plaintiff had a severe respiratory condition that met or equaled a Listing, as that report did not reflect "whether these results were obtained prior or subsequent to the administration of bronchodilators," and the testing was done while "pneumonia was suspected," with no subsequent testing to validate the earlier results.  (Tr. 31).

other specific medical evidence in the record as showing that her obesity, alone or in combination with other impairments, rendered her unable to work, her argument in this regard is not well taken.

### 3.     Selective Consideration of Evidence

In her third assignment of error, Plaintiff suggests that the ALJ erred by relying on only selected portions of the ME's testimony to conclude that Plaintiff had no Listing-level cardiac or respiratory impairments, despite the consistency of other testimony by the ME with other record evidence suggestive of disability. (Doc. #9 at 2).  In her supporting memorandum, however, Plaintiff seems to recast that allegation as an argument that the ALJ improperly favored Dr. Cugell's testimony over conflicting "treating-source medical evidence" from Plaintiff's pulmonologist, Dr. Yacoub, and primary care physician, Dr. Sattu. (Doc. #11 at 4).  Evaluated from either perspective, however, Plaintiff's contention is without merit.

Regardless of the extent to which portions of Dr. Cugell's testimony might be deemed "consistent with the overwhelming evidence of record considered as a whole" (*see* Doc. #9 at 2), the ME ultimately found that Plaintiff's symptoms "are not supported by any detective [objective?] measures" (Tr. 1292), and that medical evidence of any severe pulmonary or cardiac condition was "completely

lacking." (Tr. 1291). He noted on cross-examination that "[h]er breathing capacity has been tested, her lung, her cardiac function appears to be intact." (Tr. 1296). "[N]o explanation for her shortness of breath has been forthcoming" (*id.*), although Dr. Cugell suspected a "primary emotion[al] problem[,] . . . not a primary organic problem." (Tr. 1295). Such testimony is wholly consistent with and provides substantial evidentiary support for the ALJ's holding.

Conversely, Plaintiff has identified no specific excerpts from the ME's testimony that the ALJ allegedly "refus[ed] to credit" (Doc. #9 at 2) or that Plaintiff alleges would be more consistent with a different outcome. Indeed, when asked about Plaintiff's history of breathing difficultly, the ME responded that Plaintiff has

> been treated for asthma because the people treating her have . . . little else to offer her . . . They'd also often treat someone . . . having breathing trouble for asthma, and if they improve that kind of reinforces the diagnosis. So the fact that she was treated as an asthmatic doesn't automatically make that a valid diagnosis.

(Tr. 1298). Such testimony in no way can be interpreted as "entirely consistent" with the findings of treating sources Dr. Yacoub and Dr. Sattu.

In addition, despite Plaintiff's allusion to the ALJ's failure to defer to medical evidence provided by Drs. Yacoub and Sattu (*see* Doc. #11 at 3-4, 4-5),

applicable law consistently makes clear that the treating physician rule applies

only to the "opinions" of treating medical sources. *See* 20 C.F.R. § 404.1527(d)(2);

*Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544; SSR 96-2p, 1996 WL 374188, at *4.

As Plaintiff concedes, the evidence from her treating physicians appears mostly

in the form of "diagnoses and clinical findings;" "the current record contains no

residual functional capacity ('RFC') statements, *per se*, from [Plaintiff's] treating

physicians." (Doc. #11 at 4). Even Plaintiff recognizes the significance of that

omission, acknowledging that "it would have been helpful to have had RFC

opinions from the treating physicians." (*Id.* at 9).

On review, this Court has discovered only one actual "opinion" among the

voluminous records from Plaintiff's treating medical sources: that being Dr.

Yacoub's cursory letter of January 5, 2005, stating that Plaintiff had a "severe lung

condition which require[d] the use of medication and oxygen supplementation,"

and that she was "severely impaired in physical activity and require[d] assistance

with daily activities." (Tr. 732). But that letter did not specify the nature of

Plaintiff's lung condition, provided no supportive clinical findings or diagnostic

testing, stated no specific functional limitations, and gave no indication of the

expected duration of such condition. As such, the ALJ cannot be said to have

erred by failing to defer to that singular opinion over the testimony of Dr. Cugell.

4.    *Subsequent Award of Benefits*

Finally, Plaintiff proffers her subsequent award of SSI and DIB benefits, effective May 21, 2008 and purportedly "based upon some of the same or similar medical evidence" presented in this case, as proof that the ALJ erred in denying her benefits in his decision dated May 20, 2008.  (Doc. #9 at 2; *see also* Doc. #11 at 7-8 & Attachments A & B thereto, Doc. #20 at 1-3, 5).  Although Defendant correctly observes that Plaintiff's original filings did not contain a specific request for remand under Sentence 6 to consider this new evidence (*see id.*; *see also* Doc. #15 at 15), her reply memorandum suggests that "at least a remand is appropriate to allow an ME [sic] to consider the entire medical record . . . along with the medical evidence that the state agency found sufficient to support the later application as of the day after the denial in th[is] case."  (Doc. #20 at 11).  Plaintiff thus implicitly invokes Sentence 6.

As noted *supra* at footnote 7, this Court need not address arguments first raised in a party's reply brief.  Nevertheless, the Court has determined that Plaintiff's remand request also should be denied on its merits.  Under Sentence 6 of 42 U.S.C. § 405(g), this Court may remand a case to the Social Security Administration "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence

might have changed the outcome of the prior proceeding." *Melkonyan v. Sullivan*,

501 U.S. 89, 98 (1991).  The provision "was enacted, at least in part, to limit the

discretion of federal judges to remand for reconsideration of new evidence."

*Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (citations

omitted).  A Sentence 6 remand for consideration of additional evidence is

warranted only if (1) there is good cause for the failure to incorporate this

evidence into the record at the prior hearing, and (2) the evidence is new and

material.  42 U.S.C. § 405(g); *see Melkonyan*, 501 U.S. at 89; *see also Bass v.*

*McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

     Plaintiff – the party seeking a Sentence 6 remand in the present case – bears

the burden of establishing these two remand requirements.  *See Hollon ex rel.*

*Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).  To be "material,"

new evidence (1) must be relevant to and probative of an applicant's condition

prior to the Commissioner's decision, and (2) must establish a reasonable

probability that the Commissioner would have reached a different decision if the

evidence had been considered.  *Smith v. Comm'r of Soc. Sec.*, No. 1:07cv199, 2008

WL 2311561, at *6 (S.D. Ohio June 4, 2008)(Barrett, J.)(citing *Sizemore v. Sec'y of*

*Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988); *Oliver v. Sec'y of Health &*

*Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).  New evidence is cumulative and

not sufficient to warrant remand if it relates to an issue already fully considered by the Commissioner.  *Id.* (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)).  Additionally, evidence that a plaintiff's health has deteriorated since the Commissioner's decision is not material to that application, and the appropriate remedy is a new application.  *Id.* (citing *Sizemore*, 865 F.2d at 712).

Regarding "good cause," the Sixth Circuit "has taken a harder line" than some other circuit courts.  *Oliver*, 804 F.2d at 966.  In order to establish good cause in this Circuit, a plaintiff "must give a valid reason for his failure to obtain evidence prior to the hearing" for inclusion in the administrative record.  *Id.* (citing *Willis*, 727 F.2d at 554).  "Additional evidence generated for the purpose of attempting to prove disability in contrast to evidence produced by continued medical treatment does not meet the good cause requirement of the Act."  *Powell v. Comm'r of Soc. Sec.*, No. 3:07cv074, 2008 WL 886134, at *9 (S.D. Ohio March 28, 2008) (Rice, J.) (citing *Koulizos v. Sec'y of Health & Human Servs.*, 802 F.2d 458 [table], 1986 WL 17488, at *2 (6th Cir. Aug. 19, 1986) ["The test . . . is that good cause is shown for remand if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability."]).

Plaintiff implies that Sentence 6 remand is warranted here to allow Defendant to reconsider Plaintiff's application now before this Court in light of two subsequent state agency physician opinions.  (*See* Doc. #11, Attachments A & B).  A review of those opinions, dated July 20, 2009, and August 4, 2009, respectively, confirms that such evidence certainly qualifies as "new," having been rendered after the ALJ's May 20, 2008 decision in this case.

Plaintiff cannot demonstrate, however, that such evidence also is "material."  As defined for purposes of our review, "materiality" requires that any new evidence "be relevant to and probative of an applicant's condition prior to the Commissioner's decision."  *See Smith*, 2008 WL 2311561, at *6 (emphasis added).  Here, in the proffered July 20, 2009 opinion, reviewing physician James Gahman, M.D., explicitly stated that "I have looked at the final findings of 5/20/08 and find that the new file does have new and material changes."  (Doc. #11, Attachment A) (emphasis added).  Dr. Gahman then enumerated five specific pieces of medical evidence post-dating ALJ Knapp's decision that led him to conclude that Plaintiff at that time "equal[ed the] intent of Listing 3.03 B." (*See id.*).  Because Dr. Gahman specifically premised his opinion on evidence developed only after the ALJ's decision in the case, remand for consideration of such evidence is not proper under Sentence 6.  The same conclusion applies to

the August 4, 2009, opinion of James M. McKenna, M.D., who also explicitly based his finding of Listing-level equivalence on "new and material [medical evidence] from the post[-]hearing period of 2008 and 2009." (Doc. #11, Attachment B) (emphasis added). Indeed, even Plaintiff concedes that "there do appear to have been some changes in [her] medical condition since the ALJ decision in th[is] case." (Doc. #11 at 8). Under such circumstances, Sentence 6 remand is not available.

Just as such new evidence does not warrant remand under Sentence 6, that evidence is not an appropriate basis for this Court to remand the ALJ's prior decision under Sentence 4. Again, the appropriate remedy for deterioration of a plaintiff's health after the Commissioner's decision is a new application. *Smith*, 2008 WL 2311561, at *6. Plaintiff already has pursued that remedy, with substantial success. Plaintiff's allegation of error based on evidence adduced after ALJ Knapp's decision is without merit as to her DIB and SSI applications at issue in this case.

### IT THEREFORE IS RECOMMENDED THAT:

1.    The Commissioner's nondisability decision be AFFIRMED; and

2.    The case be TERMINATED on the docket of this Court.

August 13, 2010                         s/Sharon L. Ovington
                                         Sharon L. Ovington
                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).